THE PEOPLE OF THE STATE OF NEW YORK ex rel. WILLIAM J. WIELAND, Respondent, *v.* CHARLES H. KNOX and Others, Composing and Constituting the Municipal Civil Service Commission of the City of New York, Appellants.

*Civil service examination — alternative mandamus to compel the commissioners to accept examination papers — on the trial thereof a motion for a new trial on the minutes may be made —* prima facie *proof of fraud throws the burden of explanation on the applicant.*

Where issues of fact, raised by the return to an alternative writ of mandamus, are tried before a jury, the trial judge may properly entertain a motion for a new trial made upon the minutes, pursuant to section 999 of the Code of Civil Procedure, and it is not necessary that the motion be made at Special Term upon a case or exceptions or a case containing exceptions.

Where the civil service commissioners of the city of New York reject a person's examination papers, and, in a mandamus proceeding to compel them to accept such papers, establish *prima facie* that the relator's original examination papers had been abstracted from the custody of the commissioners, and the ones which he sought to have accepted had been forged and fraudulently substituted in their place, it is incumbent upon the relator to show that he was in nowise responsible for the fraud.

APPEAL by the defendants, Charles H. Knox and others, composing and constituting the Municipal Civil Service Commission of the City of New York, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 29th day of November, 1901, directing that a peremptory writ of mandamus issue compelling the appellants to accept certain examination papers of the relator and to place him upon the eligible list for promotion to the position of foreman in the fire department of the city of New York.

Also from an order made at the New York Trial Term, bearing date the 11th day of November, 1901, and entered in the office of the clerk of the county of New York, denying the defendants' motion for a new trial made upon the minutes, and also from the judgment of enrollment entered in the office of the clerk of the county of New York on the 30th day of November, 1901.

*Charles Blandy,* for the appellants.

*A. J. Skinner,* for the respondent.

HATCH, J.:

The relator was a member of the uniformed force of the fire department of the city of New York, holding the rank of assistant foreman. In July, 1898, he filed an application in due form for the position of foreman; and, in accordance with the rules of the civil service commission, submitted himself for examination and was examined upon the different subjects, and at the close of such examination he turned in his papers to the examiner then present, who gave them to the chief examiner, who kept them under lock and key until they were submitted to the examiners who were selected to pass thereon. Subsequently the examiners so chosen passed upon the papers of the relator, and, in accordance with the usual practice, each indorsed the rating to which the relator was entitled upon what is called a " Marking Sheet." The work of each examiner was separate and independent of his associates. There were two examiners upon each subject, and there were six subjects upon which the relator was examined.

After the examiners had marked the rating upon the " Marking Sheet," each one in turn marked the same rating upon the back of the paper examined, and again the papers were returned to the chief clerk and by him placed in an iron case and locked. Afterwards he turned the papers over to a clerk, whose duty it was to ascertain the percentage earned, and she locked the papers in her desk. Subsequently, when this clerk came to the papers in this case, her suspicion was aroused that some of them were not correct, because of the fact that the papers were folded so as to make a crease; that the initials of the examiners were not, in her judgment, in the handwriting of the examiners, and her desk had been broken open while the papers were in her care. She called the attention of the chief clerk to the matter, and he caused an examination to be made, as a result of which the civil service commission threw out relator's papers, because they believed that some person had broken open the desk of the rating clerk and had extracted the papers of the relator therefrom, had substituted other papers therefor, and had forged the initials of the examiners thereto, and had placed new and higher ratings thereon. The result of the substitution of the papers and the forgery raised the respondent's rating from ninety-one and fifty one-hundredths, which he had earned by

his examination, to ninety-five and fifty one-hundredths, and thus brought him very much nearer the head of the eligible list, jumping him over the heads of twenty-nine other competitors, and brought him from the forty-fourth to the fifteenth on the list. After the rejection of the papers by the civil service commission, the relator asked for a rehearing, which was granted, after which the original action of the commission was affirmed. After the final rejection of the papers by the commission, these proceedings were instituted by an order to show cause why an alternative writ of mandamus should not issue, commanding the civil service commissioners to accept relator's examination papers and give him the percentage and rating which he claimed. No opposition was made to this motion, and an order was made directing the alternative writ to issue, which writ was duly issued and a return duly filed thereto. The issues thus raised were brought to trial before a jury, at the close of which certain questions were submitted to the jury and answers given as follows:

"*First.* Were the marks on the papers of the applicant, the relator herein, relating to the subjects 'locality,' 'rules and regulations' and 'law' increased after the examiners have made their ratings?" To which the jury answered, "Yes."

"*Second.* In the case of the papers on 'localities,' were entirely new papers substituted for those originally handed in by the applicant?" To which the jury answered, "No."

"*Third.* In the case of the papers on 'rules and regulations,' were entirely new papers substituted instead of the papers originally handed in by the applicant?" To which the jury answered, "No."

"*Fourth.* Were forged marks or ratings placed upon the papers containing the answers of the applicant, relating to the subjects 'locality,' 'rules and regulations' and 'law?'" To which the jury answered, "Yes."

"*Fifth.* Were the initials of the examiners forged upon these papers which are presented in Court?" To which the jury answered, "Yes."

"*Sixth.* Did the applicant, the relator himself, or by another, practice or attempt to practice, deception or fraud in his examination or in securing his eligibility or appointment?" To which the jury answered, "No."

"*Seventh.* Upon the general issue, do you find for the relator or for the respondent?" To which the jury answered, "For the relator."

After the jury had rendered their verdict, the defendants moved to set aside the answers to each of the several questions which the jury had found in favor of the relator, upon the ground that the answers to such questions were inconsistent with the answers to the questions finding that the ratings of the relator had been increased ; that the ratings appearing upon the papers were forged, as were also the initials of the examiners, and that such answers were against the weight of evidence. The defendants also moved to set aside the verdict upon the general issue in favor of the relator upon the ground that the same was contrary to the evidence, to the weight of evidence and contrary to law. This motion was denied as to each of the matters to which it referred, and the order denying the same was duly entered by the defendants. A motion was thereupon made at Special Term by the relator for the issuance of a peremptory writ of mandamus based upon the verdict of the jury. This motion was opposed upon all of the grounds insisted upon in the return and upon the trial, and also upon the grounds stated in the motion to set aside the verdict and for a new trial. The motion for the issuance of a peremptory writ was granted and judgment was entered thereon, from which judgment and from the order denying the motion to set aside the verdict and for a new trial, an appeal was taken by the defendants to this court.

It is claimed by the relator that the facts upon this appeal are not before this court for review, for the reason that the appellants in order to raise such question were required to move at Special Term for a new trial on a case or exceptions, or a case containing exceptions, regularly settled and directed by the judge to be heard thereon. This contention cannot be upheld. By virtue of the provisions of section 2082 of the Code of Civil Procedure the proceedings after issue joined upon the facts or law on an application for an alternative writ of mandamus are in all respects the same as in an action, except as otherwise expressly prescribed in the act, and by section 2083 an issue of fact is to be tried by a jury as if it were an issue joined in an action specified in section 968, which provides what issues of fact are triable by a jury, unless by the con-

sent of the parties it is otherwise disposed of.    In *People ex rel. Bean* v. *Clausen* (74 App. Div. 217) it was held that issues of fact joined upon the granting of an alternative writ of mandamus in their disposition become an action under the Code, not a special proceeding, and being such it is controlled by the practice governing the review of such a trial.    In *People ex rel. Coveney* v. *Kearny* (44 App. Div. 449 ; affd. on appeal, 161 N. Y. 648, on opinion below) it was said : " As an issue of fact joined upon an alternative writ of mandamus must be tried by a jury as if it was an issue joined in an action where a party had a right to trial by jury, its effect, we think, must be the same as the verdict of a jury in such an action and binding upon the court hearing the application for a final order, unless the verdict is set aside or a new trial granted."    Upon such a trial it is competent for the court, where both sides request the court to direct a verdict, to act upon such question and direct the jury to render a verdict as the court shall determine.    (*People ex rel. Gleason* v. *Scannell*, 172 N. Y. 316.)    The authorities cited to support such conclusion are the cases establishing such rule in the trial of actions. (*Adams* v. *Roscoe Lumber Co.*, 159 N. Y. 176.)    Nothing which appears in *People ex rel. Bean* v. *Clausen* (*supra*) conflicts with this view.    That case holds that the court has no power to nonsuit the relator, as such question is to be disposed of at Special Term.    It does hold, however, in accordance with the Court of Appeals, that it has power to direct a verdict, or submit the issues to the jury for their determination.    Supreme Court rule 31 does not apply.    A case is required to be made only when the Code does not provide another method of review.    It follows, therefore, that the practice adopted by the defendants was proper, and the motion for a new trial, as provided by the provisions of section 999 of the Code, was properly entertained, and a case was not necessary (Code, §§ 997, 998), and an appeal from such order brings the matter properly before this court.

When the jury gave affirmative answers to the first, fourth and fifth questions, it followed as a necessary conclusion that the other questions should also have been answered in the affirmative. It was conceded that the examiners placed upon the relator's papers, which were handed in at the close of the examination, particular ratings ; that the ratings upon the present papers have been forged, together with the initials of the examiners.    It, therefore, follows

that these cannot be such papers, for the reason that they do not contain the ratings which the examiners made, or their initials, but both ratings and initials are forged.  The examiners did not place any other marks upon such papers, and the marks appearing upon these papers are not those marks.  There is but one set of ratings and initials upon the papers presented.  There have been no erasures thereon, nor any other marks relating to this subject, but those which are forged ; consequently they are not the papers and cannot be those which the examiners considered and marked.  If they were, such marks would appear thereon, or the fact of the erasures. The ratings upon these papers are different from those which were placed upon the original papers.  It is evident, therefore, that when these facts were found, the case of the relator was disproved; the substitution of other papers necessarily followed as well as relator's participation therein.

Aside from this question, it seems clear, beyond controversy, that the verdict rendered by the jury answering the other questions in the negative and their general verdict are against the weight of evidence.  Upon the examination of the relator for promotion, in addition to the papers to which we have already called attention, he was required as a part of such examination to write from dictation.  The original paper, which he then wrote, was preserved and is identified by the relator as his genuine product.  It consists of fourteen lines, written upon a blank furnished by the commissioners, in size a trifle larger than a sheet of legal cap paper.  The matter written shows an omission of some words necessary to preserve a continuity in the subject-matter of the dictation.  In addition to this, although there are scant fourteen lines of the writing, eighteen mistakes, mostly in orthography, are made.  It is conceded that the other papers are in the handwriting of the relator.  These papers, three in number, consist of eleven pages, precisely the same in size, and otherwise as the sheet upon which the dictation was written.  Scarcely an error in orthography is found therein, and while the sheets are for the most part closely written, very few errors of any character are to be found.  It is remarkable, to say the least, that at the same time and under the same circumstances, a person should write fourteen lines and commit eighteen errors, and write eleven pages and commit no substantial errors.  A comparison of the admittedly genuine paper

with the others shows in this respect internal evidence of so conclusive a character as to convince the mind that the two sets of papers were not written at the same time and under the same circumstances. The dictation paper carries upon its face the evidence of haste and genuineness. The other papers upon their face carry the evidence of most careful preparation, in which great care must have been taken with respect to orthography and correctness in writing which would not be likely to obtain unless the writer was possessed of an abundance of time and the opportunity to consult material necessary to insure accuracy in the use of words, proper spelling and information. In other words, it is evident that one is the product of pressure, and the other of deliberation and time in preparation, with opportunity to consult authorities upon the subject to which the examination related.

In addition to this, it appears that accurate information is given in respect of matter beyond the power of the ordinary memory to retain. Indeed, so accurate is the statement of knowledge upon the given subjects that it would not be out of place in an encyclopædia relating thereto. The first question propounded upon the subject of "localities" reads as follows: "A large and dangerous fire occurs in Madison Square. State what companies would probably be called, the location of each company's quarters and the route which would ordinarily be followed by each." In answer to this question relator stated: "For a large and dangerous fire in Madison Square it is probable that Box 427 would be pulled and a 5th alarm sent out the following companies would go." Then follows a specification of thirty different fire companies, with the respective route which each would take to reach the fire, and in addition thereto that the chief of the department, deputy chief of the second division and battalion chiefs from six battalions named would also respond. In the paper upon "rules and regulations," the following question was asked: "On what regular occasions must the National Standard be displayed at the peak, and when at half mast?" In answer to this question the relator said: "At the peak on Jan. 1, Feb. 12 & 22nd, April 27, May 30, June 14, July 4th, Nov. 30, Dec. 25th, and other days as may be designated by the President of the United States, the Governor of the State of New York, on inspection days or parade of one or more battalions of the Dept., on formal

visits of the Governor of this State, Mayor of this City or a fire commissioner or inspecting officer and when officially directed to do so, at half mast on the receipt of official notice of the death of an officer holding a position in the National, State or City Government, a fire commissioner, an officer or any member of this Dept. who may lose his life in discharge of duty, upon the death of any member of the uniformed force from other causes the company to which he was assigned will display the flag at half mast until sunset on the day of the funeral." In the paper upon "law" it is shown that the relator qualified himself to be a lawyer, if nothing else. The first question called for a description of the bureaus into which the fire department is divided. The question was accurately answered, the three bureaus given and the duties stated in legal phraseology. The second question was: "What are the legal qualifications for membership of the Fire Department?" The relator answered: "No person shall be appointed to membership or continue to hold membership in the fire Dept. that is not a Citizen of the United States, or any one who has ever been convicted of a felony, or shall any man be appointed who cannot read & write the English language understandingly, must also be less than thirty years old and must be over the age of 21 years, sec. 734, Chapt. 378, Laws of 1897." The next question, "From what duties of a citizen is a member of the Fire Department relieved?" the relator answered: "No person holding office in the Fire Department shall be liable to military or jury duty, or to arrest on civil process, or while actually on duty to service of subpœnas from Civil Courts, as sec. 736, Chap. 378, Laws of 1897." The fourth question reads: "Under what circumstances may a building be demolished by the Fire Department, and what, if any, remedy has the owner of such building for the loss of his property?" The relator did not answer this question in order, but upon the last sheet of the examination paper the answer is given as follows: "When a building or buildings in this City are on fire it is lawful for the fire commissioner to direct and order the same or any other building which he may deem hazardous and likely to take fire or convey it to other buildings to be pulled down or destroyed. Upon the application of any man or person interested in any such building so pulled down or destroyed to the Supreme Court in and for this

county, or any adjoining county in the Judicial Department in which such building is or was situated, it shall be its duty to issue a precept for a Jury to inquire into and assess the damages which the owner or the owners have sustained, and the proceedings thereon shall be taken as nearly as if the land had been taken for public purposes, and when the inquiry and assessment is confirmed by the court the amount so assessed shall be paid by the City of New York to the owner or owners to the full satisfaction of all the persons interested in the building or buildings, the court can also compel the attendance of jurors and witnesses upon any such loss as stated in sec. 754, chap. 378, Laws of 1897." The fifth question reads: "Of what common privileges of a citizen is a fireman deprived?" The relator answered: "If any officer or member of this Fire Department is publicly nominated for any office elective by the people and does not decline the said nomination within ten days after being so notified, it will be taken for granted that he has vacated his office as per sec. 732, 378, Laws 1897." The sixth question reads: "What is the penalty imposed for a chimney fire or for a bon-fire, and what disposition is made of money coming from such penalties?" The relator answered: "No person shall kindle any fire or furnish the material for it or in any way authorize or allow any fire to be made in any street, lane, Ave., road or alley or on any pier, wharf or bulkhead, except under such regulations & Permit granted by the fire commissioner under a penalty of $10.00 fine for each and every offense. If any chimney flue or stove pipe shall take fire the occupant of the premises shall forfeit the sum of $5.00, all fines like this when collected are deposited for the benefit of the Fire Department relief fund, as per sec. 760, chapt. 378, Laws of 1897, also sec. 789, Chap. 378, Laws of 1897."

The answers to these questions are given in nearly the exact language of the charter provisions upon the subject contained in the sections to which the reference is made, and in each instance the reference is accurate to the particular section. We think that it is entirely safe to say that there is no lawyer practicing at the bar of this court, nor any member of the court itself, who could from memory have made answers to these questions in the exact language used in the charter provisions and made reference to the particular sections in which they are found or stated the same in substance. Some

of the sections to which reference is made referred to other matters and covered other subjects, but the answer selects with unerring accuracy the particular matter in the charter to which the question directs attention and with absolute faithfulness sets down the answer in the language used. We are asked to believe that the relator under the pressure of an examination did all this; recalled to his memory the exact language of the section and its number. The questions which we have quoted from the other papers written by the relator at the same time show that the examination covered quite a wide range of subjects, but in each one the memory of the relator rises equal to the occasion, and the accuracy of his information with respect to those matters is little less than marvellous. We think that a military commander, charged with knowledge upon the subject, might find it somewhat difficult without reference to a manual to know just when and on what days and at what particular hours the flag was to be floated at the peak and at half mast, and also to the particular and somewhat obscure occasions when its display is called for.

We have quoted sufficiently from the examination papers to show that they bear internal evidence that the person who wrote them must have had before him the authorities from which he wrote the matter at the time he wrote. When comparison is made of these papers in which the relator sets down the information with such accuracy and with so few mistakes, with the dictation paper, which is concededly his, and considering the number of mistakes therein made and the inaccuracy of expression in the fourteen lines, the mind is driven irresistibly to the conclusion that the two classes of papers were not written at the same time nor under the same circumstances. In addition to this, the ink which appears upon the dictation paper is a black-blue color. The ink used in writing the other papers is a plain black color. The evidence upon the part of the defendants tended to show that the black-blue ink was the ink used at this examination, and that a plain black ink was not and had not been furnished for use. This discrepancy is so apparent that the relator was called upon to explain. His statement in effect was that the ink well in the stand which he used had become low and muddy, and as his neighbor's ink well was being replen-

ished, he asked that his might also be and that this accounts for the difference in the shade of the inks, the dictation being written by the first and the other papers by the last. The ink which wrote the dictation paper was not muddy, as it evidently flowed freely, and the same is true of the other ink. Both are different in color, and no foreign mixture of different colored inks is shown in either. This circumstance might not be of controlling importance, perhaps, were there not others in the case.

The proof, therefore, both from the internal evidence of the papers themselves; the difference between the dictation papers and the others; the accuracy of one and the mistakes of the other; the difference in ink; the forgery of the examiners' marks; the creased paper and the burglarized desk, lead with irresistible force to the conclusion that the original examination papers, relating to the three subjects handed in by the relator, were abstracted from the desk of the percentage clerk, and the present papers, upon which the relator relies, were substituted therefor.

It necessarily follows from this conclusion that the relator was a party to the fraud thus perpetrated. The handwriting upon each paper is his. The three papers, therefore, could not be substituted for the originals without his active agency and participation therein.

By virtue of the provisions of section 13, chapter 370, Laws of 1899, the commissioners were authorized to reject the papers upon its appearing that a fraud had been practiced, or deception attempted, and refuse to give the applicant standing upon the eligible list. When it appeared that the marks and ratings of the examiners had been forged, a basis was at once established for the action which was taken by the commissioners, and it thereupon devolved upon the relator to show, in explanation of the same, that he was not a party thereto and had no knowledge thereof. In respect of this question, the court charged the jury that the presumption of innocence was in favor of the relator, and that the burden of proof was upon the defendants to establish by a preponderance of evidence that the relator himself, or another, had practiced, or intended to practice, fraud in his examination in securing his eligibility for appointment. To this charge the defendants excepted. The exception must be sustained. The proof having *prima facie* established that the commissioners were justified in their action, the burden

devolved upon the relator to show that he was in nowise respon-
sible therefor. (*Blunt* v. *Barrett*, 124 N. Y. 117; *Whitlatch* v.
*Fidelity & Casualty Co.*, 149 id. 45.)

For these reasons, therefore, the judgment and order appealed
from should be reversed and a new trial granted, with costs to the
appellant to abide the event.

VAN BRUNT, P. J., PATTERSON, INGRAHAM and LAUGHLIN, JJ.,
concurred.

Judgment and order reversed, new trial ordered, costs to appel-
lant to abide event.